| | |
|---|---|
| **CANUSA COPORATION,** *as a subrogee of* **ANW/CRESTWOOD, INC.** **Plaintiff,** v. **THE OWENS GROUP LTD., INC.,** **Defendant.** | Civ. No. 16-09081 (KM) (JBC) **OPINION & ORDER** |

**KEVIN MCNULTY, U.S.D.J.:**

Pending before the Court are the parties' competing motions for summary judgment. Plaintiff Canusa Corporation ("Canusa"), as subrogee of ANW/Crestwood, Inc. ("ANW"), moves for partial summary judgment on four of the affirmative defenses asserted by defendant Owens Group LTD., Inc. ("Owens"). (DE 40). Defendant Owens moves for summary judgment seeking to dismiss all of the claims in this five-count complaint. (DE 41).

For the reasons explained herein, I will grant in part and deny in part Canusa's motion for summary judgment. I will also grant in part and deny in part Owens's motion for summary judgment.

1

## I.   Summary[1]

### a. The parties

ANW, a New Jersey corporation, was "engaged in the procurement, distribution and sale of craft papers, cardstock and other related products" from the 1980's until 2012 (PSOF ¶¶ 1–2; *see also* DSOF ¶ 3). In 2012, an involuntary petition under Chapter 7 of the U.S. Bankruptcy Code was filed against ANW. (PRSOF ¶ 2). Todd Caligiure was president of ANW from 2001 until 2012. (PSOF ¶ 3).

Canusa, the plaintiff here, is a subrogee of ANW by virtue of a 2001 lending agreement in which Canusa became a secured lender to ANW. (PSOF ¶ 51). Pursuant to a bankruptcy court order, Canusa was afforded the right to commence and prosecute certain causes of action belonging to ANW, including those claims asserted here. (*Id.*; DSOF ¶ 2).

Owens is a licensed insurance broker in New Jersey. (DSOF ¶ 4). From ANW's inception until September 2011, ANW was a client of Owens. (DSOF ¶ 5; PSOF ¶ 4). Brian Bonelli was an account executive with Owens and was

---

[1]     Citations to the record will be abbreviated as follows. Citations to page numbers refer to the page numbers assigned through the Electronic Court Filing system, unless otherwise indicated:

"DE" = Docket entry number in this case.

"Compl." = The complaint filed by Canusa [DE 1].

"PSOF" = The statement of uncontested facts filed by Canusa [DE 40–2].

"PRSOF" = Canusa's responsive statement of facts to the statement of facts filed by Owens [DE 46–1].

"DSOF" = The statement of uncontested facts filed by Owens [DE 41–1].

"DRSOF" = Owens's responsive statement of facts to the statement of facts filed by Canusa [DE 45–1].

Canusa's counterstatement of uncontested facts, submitted with its opposition to Owens's motion for summary judgment, is substantively identical to the statement of uncontested facts it submitted with its own motion for summary judgment. (DE 46-2). For simplicity, I will cite only to Canusa's PSOF. Likewise, Owens's response to Canusa's counterstatement of facts (DE 48-1) is substantively identical to its responsive statement of facts, DRSOF. I will therefore cite only to DRSOF.

responsible for the ANW account beginning in 2008 through 2011. (PSOF ¶ 7; DSOF ¶ 6).

### b. ANW's warehouse and insurance needs

In July 2002, ANW leased a warehouse located at 510 Ryerson Road, Lincoln Park, New Jersey. (PSOF ¶14). ANW used this warehouse as a multifunction space—storing its inventory and property and operating its business from there. (*Id.*). The warehouse was located near a river in a FEMA-designated "A09" flood zone, *i.e.,* a high-hazard area that had the potential to flood. (*Id.* ¶ 20).

ANW, through Caliguire, worked with Owens to purchase insurance for ANW and its warehouse. (*Id.* ¶¶ 15–16). Owens procured a variety of insurance policies—automobile, property, general liability, employment practices liability, flood and other coverages. (*Id.* ¶ 17). For example, beginning in 2004, The Hartford provided ANW's primary annual packaged policy, which comprised business personal property, business income insurance, automobile insurance, and general liability insurance. (*Id.* ¶¶ 18–19). However, The Hartford package expressly excluded coverage for floods. (*Id.* ¶ 19). Owens therefore obtained a $500,000 National Flood Insurance Program ("NFIP") policy through Travelers for ANW. (*Id.* ¶ 23; DSOF ¶ 8).

Upon taking over the account in 2008, Bonelli understood that the ANW warehouse was in a flood zone and understood that ANW's inventory and personal property in the warehouse was valued at approximately $6 million. (PSOF ¶ 21). Thus, Bonelli considered ANW to be underinsured with respect to flood coverage. (*Id.* ¶ 22).

### c. Renewal of ANW's policies

On April 8, 2011, Bonelli and his supervisor, Jean Dennehy, went to the ANW warehouse to meet with Caliguire to discuss ANW's insurance needs and renewal of its policies. (PSOF ¶ 27; DSOF ¶ 9). Bonelli and Dennehy observed that the warehouse was located near a river and thus was susceptible to flooding. (PSOF ¶ 29).

3

That April 8, 2011 meeting primarily focused on renewal of The Hartford package of policies; however, the issue of increasing ANW's flood insurance was also discussed. (*Id.*; DSOF ¶ 9). While the parties do not recall who first suggested the possibility of acquiring excess flood insurance, they do not dispute that Bonelli and Dennehy agreed during the meeting to attempt to provide ANW with quotes for excess flood insurance. (PSOF ¶ 29).

After the meeting, on April 11, 2011, Bonelli emailed The Hartford and a representative at Westrope, Vincent Flemming, regarding excess flood insurance for ANW. (*Id.* ¶¶ 33–34). Westrope was a wholesale insurance broker that Owens used for excess and surplus lines of insurance. (*Id.* ¶ 35).[2] Bonelli indicated that he was interested in sourcing $6 million in flood coverage for ANW and asked Flemming to provide a quote. (*Id.* ¶ 36).

On April 19, 2011, Flemming responded to Bonelli with a "quote indication" of $26,000 for $2 million in coverage. (*Id.* ¶ 37). This was not a formal quote, but Bonelli understood that one would be made available on request. (*Id.* ¶ 38). Bonelli never informed Caliguire in writing of this quote indication. (*Id.* ¶ 39).

Caliguire and Bonelli next spoke at least twice via telephone on May 3, 2011. (*Id.* ¶ 40).[3] The parties dispute the contents of those conversations.

Caliguire contends that he and Bonelli discussed The Harford policy renewal, reduction of ANW's business personal property insurance in California from $250,000 to $100,000, and reduction of ANW's business income insurance from $6 million to $2 million or less. (*Id.* ¶¶ 40, 42). The quote indication from Westrope was never discussed, says Caliguire, and therefore

---

[2]    Owens and Westrope had a contractual relationship whereby Owens's brokers would receive a commission for any excess or surplus insurance policies placed with Westrope. (PSOF ¶ 35).

[3]    The parties dispute the number of phone calls that took place between Bonelli and Caliguire. Canusa stated that they had two telephone conversations on May 3, 2011. (PSOF ¶40). Owens contends they spoke three times and points to phone records that show that someone at Owens called the main number for ANW three times that day. (DE 45-4 at 17).

never rejected. (*Id.* ¶ 41). Instead, according to Canusa, Bonelli informed Caliguire that excess flood insurance was not available. (*Id.* ¶ 40). This last point—that the ultimate message conveyed to Caliguire was that excess flood insurance was not available—Owens curiously concedes for purposes of these motions while also contesting the contents of the conversations. (*See* DSOF ¶ 10).

According to Owens, Bonelli informed Caliguire of the Westrope quote indication during their May 3, 2011 telephone conversations. Caliguire rejected the quote, says Owens, because Caliguire claimed that $26,000 was too costly. (DRSOF ¶¶ 39–41). Owens points to ANW activity reports as confirmation of its position. These activity reports contain notes inputted by Bonelli. On May 3, 2011, for example Bonelli made this entry: "Todd advised to lower BPP for CA to 100K instead of 250K, andhe is still considering lowering the BI as he feels it is to high. I have requested revised quotes for 2MM adn 4MM per his request." (DE 45-4 at 76; *sic* in original). An entry from a minute later reads "PCKG: request revised with 100K BPP in CA, also requesting lower BI to 2MM and 4MM." (*Id.*). In separate entries from May 3, 2011, under "FLOD: Excess flood indication" the following activities were reported: "Spoke with insured and he advised that he feels 2MM is to high. If you were to quote 500K and 1MM would we still be hitting the minimum premium of 25k?", "advised insured he advised 2MM might be to high, wants quotes for500K and 1MM. requested from underwriter", and "received confirmatinof ro carrier that we woul dstill be hitting minimum premium of 25K" under lower limits. (DE 45-4 at 78; *sic* in original). No other entries related to flood insurance indicate what follow-up information, if any, was conveyed to ANW.

### d. Hurricane Irene

On August 28, 2011, Hurricane Irene made landfall in New Jersey. (PSOF ¶ 46; DSOF ¶ 11). As a result, the ANW warehouse was flooded and a significant portion of ANW's inventory and property was destroyed. (PSOF ¶ 47; DSOF ¶ 11). There was approximately $6 million in inventory in the warehouse

at the time. ANW was paid $500,000 under its NFIP flood insurance policy, but its total losses far exceeded that amount. (*Id.*).

### e. The Complaint

On December 8, 2016, Canusa filed its complaint in this action. (DE 1). The complaint asserts five causes of action:

**Count 1**: Negligent Procurement of Insurance/Malpractice (Compl. ¶¶ 24–31);

**Count 2**: Negligent Misrepresentation (Compl. ¶¶ 32–41);

**Count 3**: Breach of Fiduciary Duty (Compl. ¶¶ 42–52);

**Count 4**: Breach of Contract (Compl. ¶¶ 53–61);

**Count 5**: Breach of Implied Covenant of Good Faith and Fair Dealing (Compl. ¶¶ 62–73).

On January 25, 2017, Owens filed its answer to the complaint and asserted 21 affirmative defenses. (DE 6). During the course of discovery, Owens withdrew eight (*see* stricken items in chart, below), but continued to assert 13 affirmative defenses (PSOF ¶ 57):

| | **Affirmative Defense** |
|---|---|
| 1. | Failure to State a Claim |
| 2. | No Legal Duty |
| ~~3.~~ | ~~Waiver, Laches, Res Judicata, Collateral Estoppel, Judicial Estoppel, and Equitable Estoppel~~ |
| ~~4.~~ | ~~Statute of Limitations~~ |
| 5. | Mutual Mistake |
| 6. | Assumption of Risk |
| 7. | All Applicable Defenses under the Contract |
| 8. | Failure to Mitigate |
| 9. | Damages were Caused by Plaintiff or a Third Party |
| 10. | Comparative Negligence |
| 11. | Owens complied with all laws |
| 12. | No Proximate Cause |
| 13. | Frivolous Pleading |
| 14. | Absence of Privity |
| ~~15.~~ | ~~Unclean Hands~~ |
| ~~16.~~ | ~~Fraud~~ |
| ~~17.~~ | ~~Entire Controversy Doctrine~~ |
| ~~18.~~ | ~~Failure to Join Necessary Parties~~ |
| ~~19.~~ | ~~Failure to Supply an Affidavit of Merit~~ |

| 20. | ~~Absence of a Contract~~ |
| 21. | Catchall |

### f. Competing motions for summary judgment

On March 29, 2019, the parties filed the competing motions for summary judgment at issue here.

#### i. Canusa's motion (DE 40)

Canusa moved for partial summary judgment seeking to dismiss four affirmative defenses raised by Owens in its Answer: (1) the Second Affirmative Defense: No Legal Duty; (2) the Sixth Affirmative Defense: Assumption of Risk; (3) the Eighth Affirmative Defense: Failure to Mitigate; and (4) the Tenth Affirmative Defense: Comparative Negligence.

Owens's second affirmative defense is "that it had no legal duty to procure excess flood insurance for ANW . . . ." (PSOF ¶ 59; DRSOF ¶ 59). Canusa moves to dismiss this defense while simultaneously moving for an order that Owens had a duty as a matter of law to act in good faith and with reasonable skill when it undertook to provide ANW excess flood insurance quotes. (DE 40-1 at 5).

Owens's sixth affirmative defense is that "Todd Caliguire, who is a sophisticated businessman, assumed the risk that his business would be flooded when he moved into a flood zone and close to a body of water. In addition, Mr. Caliguire (ANW) assumed the risk that he would not have enough flood insurance when he decided not to purchase excess flood insurance offered to him by Owens Group prior to Hurricane Irene." (PSOF ¶ 60; DRSOF ¶ 60). Canusa asserted in its briefing that Owens's assumption of the risk defense should be dismissed because New Jersey has essentially eliminated this defense except in limited circumstances not applicable here. (DE 40-1 at 16–17). Owens agrees and withdrew this defense. (DE 45 at 10). Accordingly, Canusa's motion to dismiss Owens's sixth affirmative defense is **GRANTED.**

Owens's eighth affirmative defense is "that ANW failed to procure excess flood insurance and therefore failed to mitigate its damages from Hurricane Irene. In addition, it is unclear at this time whether ANW could have taken any

additional steps to minimize its damages after Hurricane Irene, including but not limited [to] exploring the immediate sale of its business or salvage of any damaged equipment or property." (PSOF ¶ 61; DRSOF ¶ 61). Canusa moves to dismiss this defense because Owens failed to uncover any evidence in discovery to support its contention that ANW failed to mitigate damages. (DE 40-1 at 18).

Owens's tenth affirmative defense is one of comparative negligence:

> ANW was comparatively negligent in that it placed its craft paper business in a flood zone and failed to procure sufficient flood insurance, including excess flood insurance, available to ANW. Canusa was comparatively negligent in that its President, Mr. Fleming, who owned 1/3 of ANW and was aware that the company sold craft paper and related paper products and was in a flood zone, never inquired whether ANW had sufficient flood insurance in place. Canusa was also comparatively negligent in that it lent millions of dollars to ANW with generous increases in ANW's line of credit, despite ANW having financial difficulties.

(PSOF ¶ 62; DRSOF ¶ 62). Canusa contends that this affirmative defense is unavailable as a matter of law where the claim is one of professional malpractice. (DE 40-1 at 20).

### ii. Owens's motion (DE 41)

Owens has filed a motion for summary judgment (DE 41) dismissing Counts I through V. Regarding Count I (malpractice), Owens asserts that plaintiff has failed to carry its burden of establishing a duty owed by Owens to ANW to offer it excess flood insurance. (DE 41-4 at 7–11). Counts II (negligent misrepresentation) and III (breach of fiduciary duty), Owens asserts, are subsumed under Count I and should be dismissed. (*Id.* at 12–15).

Finally, with respect to Counts IV (breach of contract) and V (breach of implied covenant of good faith and fair dealing), Owens moved for summary judgment. Canusa did not oppose this portion of Owens's motion and agreed to the dismissal with prejudice of these claims. (PSOF ¶ 55; PRSOF ¶ 13).

Accordingly, Owens's motion for summary judgment with respect to Counts IV and V is **GRANTED**.

## II.    Discussion

As a result of sound concessions by the parties, this summary judgment discussion is now narrowed to Counts I, II, and III of the Complaint, and the Second, Eighth, and Tenth Affirmative Defenses.

### a.  Legal standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 247–48, 106 S. Ct. 2505, 2509–10 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000).

"When the moving party has the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact." *In re Bressman*, 327 F.3d 229, 238 (3d Cir. 2003) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 (11th Cir. 1991)). That is, the moving party must demonstrate that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *Id.*

On the other hand, "with respect to an issue on which the nonmoving party bears the burden of proof ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554 (1986). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, ... there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v.*

9

*Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322–23, 106 S. Ct. at 2552).

To demonstrate the existence of a genuine issue, a party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986). Likewise, "unsupported allegations ... and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990). Rather, a party must present evidence sufficient to create a triable issue. *Anderson*, 477 U.S. at 248–49, 106 S. Ct. at 2510; *Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). By evidence, the Rule means "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). In construing such evidence, however, the court must draw inferences in the light most favorable to the nonmoving party. *See Boyle v. County of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998).

In deciding a motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 248–49, 106 S. Ct. at 2510. Credibility determinations are the province of the fact finder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

### b. Professional Malpractice (Count I)

With respect to Count I (Professional Malpractice), both sides' summary judgment motions seek a ruling as to the existence and scope of any duty that Owens owed to ANW.

Canusa asserts that, as a result of Bonelli's April 2011 undertaking to look into excess flood insurance, Owens took on a professional duty to

10

competently pursue excess flood insurance quotes for ANW. (DE 40-1 at 12). Canusa therefore moves for partial summary judgment on Count I, seeking an order that as a matter of law Owens owed a duty of professional care to ANW in connection with obtaining suitable flood insurance.

Owens's motion rests on a legal view contrary to that of Canusa as to the nature and scope of its duty. Owens seeks a ruling that it did not have a legal duty to offer excess flood insurance to ANW, even if it was available, because it had no duty to advise ANW regarding its possible insurance needs. (DE 41-4 at 7–8). Therefore, Owens argues, summary judgment must be granted dismissing Count I as a matter of law. (DE 41-4 at 7).

For the reasons outlined herein, I will grant that portion of Canusa's partial motion for summary judgment on the limited issue of duty and deny Owens's motion for summary judgment, both with respect to Count I.

### i. Discussion

Under New Jersey law, "[t]he existence of a duty to exercise reasonable care to avoid a risk of harm to another is a question of law."[4] *Fackelman v. Lac d'Amiante du Quebec*, 942 A.2d 127, 134 (N.J. Super. Ct. App. Div. 2008). The determination of whether or not there is a duty, however, is dependent on the specific facts of each case. *Wang v. Allstate Ins. Co.*, 592 A.2d 527, 534 (N.J. 1991). The duties owed by an insurance broker, like Owens, to its clients were elucidated in *Aden v. Fortsh*, 776 A.2d 792 (N.J. 2001):

> The import of the fiduciary relationship between the professional and the client is no more evident than in the area of insurance coverage. Insurance intermediaries in this State must act in a

---

[4] No substantial choice of law issue is presented. "[I]n a diversity action, a district court must apply the choice of law rules of the forum state to determine what law will govern the substantive issues of a case." *Warriner v. Stanton*, 475 F.3d 497, 499–500 (3d Cir. 2007) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). The parties do not dispute that in this diversity action, based on an accident in New Jersey, New Jersey law applies. *See, e.g., McCarrell v. Hoffmann-La Roche, Inc.*, 227 N.J. 569, 590 (2017) ("[I]n a personal-injury action, the substantive law of the place of injury is presumed to be the governing law under section 146" of the Restatement (Second). "Absent another state having a more significant relationship, the substantive law of the injury-site state applies.").

fiduciary capacity to the client "[b]ecause of the increasing complexity of the insurance industry and the specialized knowledge required to understand all of its intricacies." *Walker v. Atl. Chrysler Plymouth, Inc.*, 216 N.J. Super. 255, 260 (App. Div. 1987) (quoting *Sobotor v. Prudential Prop. & Cas. Ins. Co.*, 200 N.J. Super. 333, 341 (App. Div. 1984)); *see also* N.J.A.C. 11:17A–4.10 ("An insurance producer acts in a fiduciary capacity in the conduct of his or her insurance business."). The fiduciary relationship gives rise to a duty owed by the broker to the client "to exercise good faith and reasonable skill in advising insureds." *Weinisch v. Sawyer*, 123 N.J. 333, 340 (1991).

Accordingly, an insurance broker who agrees to procure a specific insurance policy for another but fails to do so may be liable for damages resulting from such negligence. *Rider v. Lynch*, 42 N.J. 465, 476, 201 A.2d 561 (1964). Liability resulting from the negligent procurement of insurance is premised on the theory that a broker "ordinarily invites [clients] to rely upon his expertise in procuring insurance that best suits their requirements." *Id.* at 477, 201 A.2d 561. The concept is essentially one of professional malpractice.

*Aden,* 776 A.2d at 800–801.

In *Rider v. Lynch,* a prospective insured requested automobile liability coverage and then relied on the insurance broker's recommendation that a certain type of policy would cover a particular risk. 201 A.2d 563–64. However, unbeknownst to the insured, the policy's limitations excluded that particular risk. *Id.* at 563–66. When that particular risk materialized in the form of a collision, coverage was denied. *Id.* at 566. Ultimately, the New Jersey Supreme Court "reversed the dismissal of the plaintiff's claim against the broker, concluding that a factual question existed with regard to whether the broker breached his duty of care. The Court noted that because of the nature of the principal-agent relationship, the broker was charged with the knowledge that the policy did not fit his client's need and, even if the broker was not aware of the limited policy coverage, he was under a duty to examine and reject the policy himself before delivering it to the [client]." *Aden,* 776 A.2d at 801. The Court held that an insured is "entitled to rely upon and believe that the broker

had fulfilled his [or her] undertaking to provide the coverage ... agreed upon, and that the policy sent ... represented accomplishment of that undertaking." *Rider*, 201 A.2d at 570. The Court elaborated:

> One who holds himself [or herself] out to the public as an insurance broker is required to have the degree of skill and knowledge requisite to the calling. When engaged by a member of the public to obtain insurance, the law holds him [or her] to the exercise of good faith and reasonable skill, care and diligence in the execution of the commission. He [or she] is expected to possess reasonable knowledge of the types of policies, their different terms, and the coverage available in the area in which his [or her] principal seeks to be protected. If he [or she] neglects to procure the insurance or if the policy is void or materially deficient or does not provide the coverage he [or she] undertook to supply, because of his [or her] failure to exercise the requisite skill or diligence, he [or she] becomes liable to his [or her] principal for the loss sustained thereby.

*Id.* at 567 (citations omitted).

Thus, as clarified more recently by the New Jersey Supreme Court in *President v. Jenkins*, 853 A.2d 247, 257 (N.J. 2004), an insurance broker owes a prospective insured a threefold duty: (1) to procure the insurance; (2) to secure a policy that is neither void nor materially deficient; and (3) to provide the coverage he or she undertook to supply.

### ii. Analysis

The parties' competing motions for summary judgment primarily implicate the third way in which an insurance broker owes a duty to its client: to exercise reasonable professional care in providing the coverage he or she undertook to supply.

Plaintiff moves for a ruling that as a matter of law Owens took on a duty of care when ANW asked it to look into a quote for flood insurance and Owens agreed to do so. (DE 40-1 at 12–15). Relatedly, plaintiff moves for an order dismissing Owens's second affirmative defense, *i.e.,* that Owens owed no legal duty to ANW. (*Id.*).

Owens opposes Canusa's motion and moves for summary judgment seeking an order that it "did not have a duty to procure excess flood insurance, and it was consistent with New Jersey law for Owens to inform ANW that excess flood insurance was unavailable or that it could not procure it." (DE 45 at 10; *see also* DE 45 at 4)). Here, Owens relies heavily on *C.S. Osborne* and *Wang*, which held that "Absent a special relationship, 'there is no common law duty of a carrier or its agents to advise an insured concerning the possible need for higher policy limits upon renewal of a policy.'" *C.S. Osborne & Co. v. Charter Oak Fire Ins.* Co., No. A-2182-15T4, 2017 WL 1548796, at *5 (N.J. Super. Ct. App. Div. May 1, 2017) (citing *Wang*, 592 A.2d at 532).

Owens's argument is correct as far as it goes; New Jersey law does not require an agent to officiously seek out coverage based on the agent's unilateral perception that the client needs it. But this case does not arise from an insurer's failure to recognize its client's need for more insurance or higher policy limits. Indeed, the undisputed facts establish the opposite: both parties were aware that ANW wanted and needed additional flood insurance, and they discussed Owens's providing ANW with quotes for insurance commensurate with the value of its inventory. (PSOF ¶ 22; DSOF ¶ 9).

The question narrows to the scope of Owens's duty once ANW asked it to obtain quotes for flood coverage and Owens agreed to do so. The underlying facts relevant to the existence of a duty are largely undisputed. On April 8, 2011, Owens's insurance broker, Bonelli, went to ANW's warehouse to discuss insurance coverage issues with ANW's President, Caliguire. (PSOF ¶ 27; DRSOF ¶ 27). At this meeting, Bonelli mentioned the possibility of getting excess flood insurance. (PSOF ¶ 29; DRSOF ¶ 29). Bonelli agreed to look for and supply ANW with potential insurance quotes. (PSOF ¶ 30; DRSOF ¶ 30). Bonelli then reached out to various third parties to see if they would provide excess flood insurance to ANW. (PSOF ¶¶ 33–34; DRSOF ¶¶ 33–34). Westrope responded, offering $2 million in coverage at a cost of $26,000, which Bonelli understood to mean that coverage was available. (PSOF ¶¶ 37–38; DRSOF ¶¶ 37–38).

Under these circumstances, I hold that Bonelli had a duty to exercise good faith and reasonable skill in seeking out quotes, and then to follow through by relaying that information to ANW for its approval or rejection. *See Rider*, 201 A.2d at 567; *Jenkins*, 853 A.2d at 257.[5] Whether Bonelli *did* exercise such skill and care is an issue for another day. Both sides concede that material facts are disputed concerning the actions Bonelli took upon learning of the Westrope quote. For instance, Canusa contends that Bonelli never relayed the Westrope quote to Caliguire, and indeed represented that coverage was not available. (PSOF ¶¶ 39–41). Owens alleges the opposite: that Bonelli relayed the substance of the quote to Caliguire, who rejected it as too expensive. (DRSOF ¶ 41).

Accordingly, Canusa's motion for summary judgment is **GRANTED** on the limited issue of whether Owens owed ANW a duty to exercise reasonable care to provide the coverage quotes it undertook to supply. Owens's second affirmative defense that it had no duty to ANW is therefore dismissed. Owens's motion for summary judgment seeking to dismiss Count I is **DENIED**.

### c. Negligent Misrepresentation (Count II)

Turning to Count II, Owens moves for summary judgment on Canusa's negligent misrepresentation claim, asserting that this claim is subsumed by Count I, plaintiff's malpractice claim. (DE 41-4 at 12). In the alternative, Owens moves to dismiss Count II because Canusa, says Owens, has failed to allege an actionable negligent misrepresentation. (*Id.*). Canusa opposes this motion, stating that the Counts I and II are distinct and require satisfaction of different elements. (DE 46 at 22–24).

A claim for negligent misrepresentation requires proof of the following elements: "(1) an incorrect statement (2) negligently made, (3) upon which a

---

[5]     Not even Owens's expert, Thomas Ahart, denies that when an insurance broker undertakes to procure coverage, that broker has a duty to procure it or tell the client it cannot be procured. (*See* DE 41-12 at 51 ("If you've agreed to procure the coverage, you have a duty to either procure it or to tell them you can't.")).

plaintiff justifiably relied, (4) and which resulted in economic loss or injury as a consequence of that reliance." *Sarlo v. Wells Fargo Bank*, N.A., 175 F. Supp. 3d 412, 425 (D.N.J. 2015); *see also Premier Health Assocs., LLC v. Med. Tech. Sols.*, No. CV 17-331 (JLL), 2018 WL 4043289, at *7 (D.N.J. Aug. 24, 2018).

While "a Fiduciary duty between the parties is not an element of a claim for negligent misrepresentation," a plaintiff seeking to recover for negligent misrepresentation must nonetheless establish that the defendant owed it a duty of care. *Kronfeld v. First Jersey Nat'l Bank*, 638 F. Supp. 1454, 1465 (D.N.J. 1986); *cf. New Jersey Econ. Dev. Auth. v. Pavonia Rest., Inc.*, 319 N.J. Super. 435, 446, 725 A.2d 1133 (App. Div. 1998) ("a party has no duty to disclose information to another party in a business transaction unless a Fiduciary relationship exists between them, unless the transaction itself is fiduciary in nature, or unless one party 'expressly reposes a trust and confidence in the other.' "). "The question of whether a duty exists is a matter of law properly decided by the court, not the jury, and is largely a question of fairness or policy." *Wang*, 592 A.2d 527 (1991).

Professional malpractice is, of course, a variety of the tort of negligence. It need not, however, involve misrepresentations of any kind; it may rest on substandard performance. So Counts I and II are not equivalent as a legal matter.

It must be said, however, that the facts underlying these two counts overlap. Owens, negligently or not, is alleged to have made the false representation to ANW that excess flood insurance was not available. (*Compare* Compl. ¶ 27 (alleging under Count I that Owens told ANW excess flood insurance was unavailable) *with* Compl. ¶ 38 (alleging under Count II that the Owens group was negligent in representing that excess flood insurance was unavailable)). Further, neither party denies that ANW was underinsured and that, as a result, did not have its losses fully covered. Count II also ostensibly implicates the same broker-client relationship at issue under Count I, giving

16

rise to a duty of care, whether in performance or in the making of disclosures to the client.

Still, a plaintiff is permitted to plead as many claims as it has in the alternative, *see* Fed. R. Civ. P. 8(d), and it cannot be said that there is no genuine material issue of fact as to Count II. It may be that these two claims may be consolidated, or one may be dropped, for purposes of streamlining the case for trial. For now, however, I will not dismiss Count II as superfluous.

Accordingly, Owens's motion for summary judgment dismissing Count II is **DENIED** without prejudice.

### d. Breach of fiduciary duty (Count III)

Owens additionally moves for an order dismissing Count III as duplicative of Count I. (DE 41-4 at 14–15). However, Canusa's claim for breach of a fiduciary duty cannot be subsumed under Count I as a matter of law.

It is undisputed that Owens has a fiduciary duty to ANW. *See Aden*, 776 A.2d at 800 ("The import of the fiduciary relationship between the professional and the client is no more evident than in the area of insurance coverage. Insurance intermediaries in this State must act in a fiduciary capacity to the client "'[b]ecause of the increasing complexity of the insurance industry and the specialized knowledge required to understand all of its intricacies.'" (citing *Walker v. Atl. Chrysler Plymouth, Inc.*, 523 A.2d 665 (N.J. Super. Ct. App. Div. 1987)).

Although the allegations supporting a claim for breach of fiduciary duty and professional malpractice may overlap, "[p]rofessional malpractice actions are grounded in the tort of negligence." *Alcman Servs. Corp. v. Samuel H. Bullock*, P.C., 925 F. Supp. 252, 258 (D.N.J. 1996), *aff'd sub nom. Alcman Servs. Corp. v. Bullock*, 124 F.3d 185 (3d Cir. 1997)). In contrast, a claim that an individual breached a fiduciary duty is an intentional tort, separate from allegations concerning an individual's negligent deviation from the professional standard of care. *Fink v. Kirchner*, No. CIV.A. 12-4125 NLH, 2013 WL 1952303, at *3 (D.N.J. May 8, 2013).

Accordingly, because the claims rest upon differing standards, Count III is not duplicative or superfluous, and Owens's motion for summary judgment dismissing Count III is **DENIED**.

### e. Affirmative defenses

Finally, Canusa moves for partial summary judgment on two affirmative defenses asserted by Owens: the eighth, failure to mitigate damages, and the tenth, comparative negligence. I discuss them in turn.

### i. Failure to mitigate damages

"The difference between contributory negligence and a failure to mitigate damages is simply timing, with the latter involving plaintiff's negligence after the tort or breach." *S.K.A. Steel Trading, Inc. v. Penn Terminals, Inc.*, No. CIV. A. 96-CV-4687, 1998 WL 964195, at *1 (E.D. Pa. Dec. 3, 1998), *aff'd sub nom. S.K.A. Steel Trading Co. v. Lombard Metals Corp.*, 208 F.3d 206 (3d Cir. 2000). "Where the defendant has already committed an actionable wrong, whether tort or breach of contract, then this doctrine [avoidable consequences] limits the plaintiff's recovery by disallowing only those items of damages which could reasonably have been averted." *Ostrowski v. Azzara*, 545 A.2d 148, 154 (1988) (citing *Southport Transit Co. v. Avonale Marine Ways, Inc.*, 234 F.2d 947, 952 (5th Cir. 1956)). The doctrine "limits consideration of a plaintiff's fault to the time period that begins after a defendant's wrongful conduct." *Del Tufo v. Twp. of Old Bridge*, 685 A.2d 1267, 1282 (1996).

Owens, in support of this defense, asserts that ANW could have sought excess flood insurance on its own, after Owens conveyed that such insurance was unavailable but before Hurricane Irene hit. (DE 45 at 11). Once the hurricane damage had occurred, Owens says, Canusa should have salvaged certain equipment and inventory and used its value, or perhaps the value of the business itself, to offset its claimed damages. (*Id.* at 12). For example, Owens provides a number of invoices submitted by Canusa, where Canusa helped ANW purchase and install this equipment. Owens asserts that after ANW went bankrupt, Canusa then took back some of this equipment; Canusa

was allegedly able to use some of the phones in one of its businesses. (DE 45-4 at 37). But Owens does not suggest what value, if any, this equipment had at the time.

Canusa, seeking to dismiss this mitigation defense, states that (1) "discovery is now long over and the undisputed evidence shows that none of the damaged property was salvageable" and (2) that "Owens['s] claim that [ANW] should have sold its business after the flood has numerous flaws." (DE 40-1 at 19). Canusa suggests that the $25,000 equipment-related damages claim is related to technological property entirely destroyed by the flood, which ANW later replaced. (DE 49 at 10–11). Canusa is not specific about what exactly this equipment consisted of, or whether it had a residual value that was retained by Canusa. Those facts should be in Canusa's control, if they are anywhere.

Canusa does not seriously dispute that ANW failed to seek flood insurance on its own after Owens failed to provide it. Still, this part of the mitigation defense is entwined with genuine issues of material fact as to whether Owens discharged its duty, ANW's justifiable reliance on Owens's advice, and the extent to which ANW made a conscious decision to forgo additional flood insurance coverage. Those issues preclude summary judgment on this issue. *See* Section III.a, *supra.* For this reason alone, I would not strike the mitigation defense.

As to post-hurricane mitigation of damages, neither side really discharges its obligation to cite evidence, but the extent of damages—if liability is found—is quintessentially one for trial. The proofs will look much the same, regardless of whether mitigation is ultimately submitted to the jury as an issue. Surely Canusa does not suggest, for example, that ANW could simultaneously retain a piece of undamaged equipment and claim reimbursement for its loss. That proposition may or may not depend on a "mitigation" defense at all. Similarly, to the extent the $25,000 equipment claim rests on replacement of truly flood-damaged equipment, this may be just a case of straight loss calculation. But to the extent the contours of mitigation remain unclear,

19

Canusa's vagueness about the evidence (which is within its control) supporting the equipment claim is partially to blame.

ANW went bankrupt. As to whether Canusa or ANW had some ill-defined obligation to liquidate ANW's business in some other way in order to minimize damages, Owens fails to respond. Perhaps it is not asserting such a mitigation theory. Of course, if ANW received a good faith offer for the business and rejected this offer, that might be evidence of a failure to mitigate. *See, e.g., C & K Coal Co. v. United Mine Workers of Am.*, 704 F.2d 690, 701, n.4 (3d Cir. 1983). By contrast, if ANW made a post-hurricane attempt to sell its business or inventory, even if unsuccessful, that might be evidence that ANW complied with its duty to mitigate. *See Omni Electromotive, Inc. v. R.A. Johnson, Inc.*, No. A-0187-05T5, 2006 WL 2590120, at *6 (N.J. Super. Ct. App. Div. Aug. 8, 2006).

On the motion papers as presented, however, this is no more than hypothetical. References to mitigation in Canusa's briefing do not comply with Rule 56 and need not be accepted. Fed. R. Civ. P. 56(c) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.").

At any rate, I cannot state with confidence that the issue of mitigation is wholly out of the case. The legitimate amount of damages, if any, will be the subject of proofs at trial. Accordingly, Canusa's motion for summary judgment, to the extent it seeks to dismiss Owens's eighth affirmative defense, failure to mitigate damages, is **DENIED**.

### ii. Comparative negligence

Canusa moves for summary judgment dismissing Owens's tenth affirmative defense—*i.e.,* that Canusa's claims are barred or reduced by ANW's comparative negligence. (DE 40-1 at 19–21). Canusa asserts that New Jersey law does not allow professionals, such as Owens, to defend on this basis. (*Id.*). I agree and will dismiss this defense.

The general New Jersey rule is that in negligence actions "resulting in injury to the person or to real or personal property, the trier of fact shall make the following as findings of fact:

(1) The amount of damages which would be recoverable by the injured party regardless of any consideration of negligence or fault, that is, the full value of the injured party's damages.

(2) The extent, in the form of a percentage, of each party's negligence or fault. The percentage of negligence or fault of each party shall be based on 100% and the total of all percentages of negligence or fault of all the parties to a suit shall be 100%."

N.J. Stat. Ann. § 2A:15-5.2. The Act applies to strict liability and negligence actions, including "civil actions for damages based upon theories of negligence, products liability, [and] professional malpractice whether couched in terms of contract or tort and like theories." *Id.*

Nevertheless, with respect to a claim of negligence relating to a professional's performance of his or her duties, the settled law in New Jersey is to the contrary:

> The view that comparative or contributory negligence generally may not be charged when a professional breaches his or her duty to a client reflects our heightened expectations of professional services in this State. *See, e.g., Conklin, supra,* 145 *N.J.* at 412, 678 *A.*2d 1060 (holding injured party's negligence not relevant in attorney malpractice action); *Tobia v. Cooper Med. Ctr.,* 136 *N.J.* 335, 341, 643 *A.*2d 1 (1994) ("[W]hen a tortfeasor's duty includes exercise of reasonable care to prevent a party from engaging in self-damaging conduct, contributory negligence is barred as a defense."); *Cowan v. Doering,* 111 *N.J.* 451, 464–65, 545 *A.*2d 159 (1988) (holding that health-care professionals could not assert

contributory negligence defense against suicidal patient); *Mitchell v. Procini,* 331 *N.J.Super.* 445, 457, 752 *A.*2d 349 (App.Div.2000) ("Usually, comparative fault is not an issue in medical malpractice actions...."); *Hofstrom v. Share,* 295 *N.J.Super.* 186, 193, 684 *A.*2d 981, (App.Div.1996) (observing "particularly acute danger" in permitting jury to focus on plaintiff's alleged comparative negligence in professional negligence action), *certif. denied,* 148 *N.J.* 462, 690 *A.*2d 610 (1997); *Bryant v. Calantone,* 286 *N.J.Super.* 362, 371–72, 669 *A.*2d 286 (App.Div.1996) (same); *Conforti & Eisele v. John C. Morris Assocs.,* 199 *N.J.Super.* 498, 501, 489 *A.*2d 1233 (App.Div.1985) (noting that plaintiff's conduct did not constitute negligence in suit against design professionals); Pressler, *Current N.J. Court Rules,* comment 8.6 on *R.* 4:5–4 (commenting that comparative negligence defense "not so chargeable where the attorney's obligation was to protect the client from the self-inflicted harm that ensued").

That is not to say that the conduct of the client in a professional malpractice action is irrelevant in other respects. Illustratively, *Conklin* noted that in an attorney malpractice action, "if a client or patient deliberately violates the professional's instructions with respect to self-care or heedlessly enters a transaction regardless of any instructions on the part of the professional, the trier of fact may find that there is no causal connection between the fault and the harm, *Lamb v. Barbour,* 188 N.J.Super. 6, 12–13, 455 A.2d 1122 (App.Div.1982) ..., *certif. denied,* 93 N.J. 297, 460 A.2d 693 (1983),. . . if the conduct of the client, rather than that of the professional, was the sole proximate cause of the alleged tort, a jury may conclude that the professional is not liable.

. . .

As one commentator has accurately summarized our law, "[i]n general, the comparative fault defense will not apply in a plaintiff's suit alleging a professional's malpractice, at least in those cases in which the defendant argues that the plaintiff was at fault in failing to understand or to perform the task for which the professional was hired." *Mahoney, supra,* § 6:2–10 at 119.

*Aden,* 776 A.2d at 799–800.

    An important caveat, however, is that a defendant is not prevented from putting forth evidence that plaintiff's actions severed the causal connection between the broker's fault and the insured's harm. *Id.* at 802 ("Our disposition

does not prevent brokers from contending during trial that an insured's failure to read the policy severed the causal connection between the broker's fault and the insured's harm."). Such evidence, as I read *Aden*, is distinct from a defense of comparative negligence. Thus the striking of such a defense would not deny Owens the right to defend itself on the issues of breach and causation. Owens remains free to introduce evidence that, for example, it did not misinform ANW about the availability of insurance, or that ANW in fact rejected the Westrope quote for reasons of its own.

New Jersey holds insurance professionals and other fiduciaries to standards higher than those that apply to a non-professional accused of negligence. Accordingly, it is well-settled that Owens cannot assert a comparative negligence defense here. Canusa's motion for summary judgment, to the extent it seeks to dismiss Owens's tenth affirmative defense, comparative negligence, is therefore **DENIED**.

## ORDER

For the reasons set forth above,

**IT IS** this 19th day of December, 2019,

**ORDERED** as follows:

Canusa's motion for summary judgment (DE 40) is **GRANTED** in part and **DENIED** in part as follows:

a) Canusa's motion for summary judgment seeking dismissal with respect to Owens's second affirmative defense (no legal duty), sixth affirmative defense (assumption of risk), and tenth affirmative defense (comparative negligence), is **GRANTED**.

b) Canusa's partial motion for summary judgment on the issue that Owens had a duty to use reasonable professional efforts when undertaking to supply ANW with insurance quotes, as discussed in more detail above, is **GRANTED.**

c) Canusa's motion with respect to Owens's eighth affirmative defense (failure to mitigate), is **DENIED**.

Owens's motion for summary judgment (DE 41) is **GRANTED** in part and **DENIED** in part as follows:

d) Owens's motion for summary judgment on Counts I, II, and III is **DENIED**.

e) Owens's motion for summary judgment dismissing Counts IV and V is **GRANTED**.

**Kevin McNulty**
**United States District Judge**